MAX HASKETT, EXECUTOR OF THE ESTATE OF CLYDE C. HASKETT, MITCH KELLEY, SR., MARK WEISMILLER, HOBBS CHRISTIAN CHURCH, MAX HASKETT, ST. VINCENT'S HOSPITAL, LOLA ALLWINE, MYRTLE HOOTON AND DALE ROMACK *v.*
HARRY G. HASKETT.

[No. 2-174A20. Filed May 5, 1975. Rehearing denied June 9, 1975. Transfer denied December 30, 1975.]

*Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans,* of Kokomo, *Stanley M. Herbert,* of Tipton, for appellants.

*Joe Heaton,* of Tipton, for appellee.

SULLIVAN, P.J.—The legatees under the will of decedent Clyde C. Haskett (Legatees) appeal from a judgment by the

trial court which determined appellee Harry G. Haskett (Harry) to be the son and heir of Clyde,[1] and further determined that Harry was entitled to share in the estate as a pretermitted heir.[2]

The following facts are uncontested: Harry Haskett was born May 3, 1905 in Tipton County. His birth certificate recites that his father was Clyde Haskett, and that his mother was Effie Pore. Clyde and Effie were married on June 6, 1908, as is revealed by their marriage certificate. A daughter, Margaret, was born to Clyde and Effie about 1914. While Harry Haskett was still in his teens, he left home and thereafter visited infrequently with his family. Letters, too, became

---

1. Ind. Ann. Stat. § 29-1-2-7(b) (Burns Code Ed.) which was enacted by the 1953 General Assembly and was in effect at the time of Clyde's death, provides in part as follows:

"(b) For the purpose of inheritance to, through and from an illegitimate child, such child shall be treated the same as if he were the legitimate child of his father, if but only if, (1) the paternity of such child has been established by law, during the father's lifetime; or (2) if the putative father marries the mother of the child and acknowledges the child to be his own."

It must be noted, however, that a prior law related to establishment of legitimacy, as distinguished from the right of inheritance. The prior law, 1 R.S. 1852, Ch. 27, § 9, being Ind. Ann. Stat. § 6-2310 (Burns 1933), provided:

"If a man shall marry the mother of an illegitimate child, and acknowledge it as his own, such child shall be deemed legitimate."

Harry does not claim the benefit of the 1852 statute. Rather, he claims under § 207 of the 1954 Probate Code, Ind. Ann. Stat. § 29-1-2-7(b), *supra*, which confers only the right to inherit, not legitimacy. *See A B v. C D* (1971), 150 Ind. App. 535 at 539-547, 277 N.E.2d 599 at 603-608. He does not claim to be the legitimate son but only that he "shall be treated as if he were the legitimate child of his father". (Appellee's Brief, p. 20). Nevertheless, under the facts hereinafter set forth, Harry was legitimated before repeal, in 1954, of the 1852 statute. His legitimacy, however, is not determinative of the case before us. Harry's right of inheritance is determined by the law in effect at the time of his father's death. *Thacker* v. *Butler* (1962), 134 Ind. App. 376, 184 N.E.2d 897. That law merely requires that he be either a legitimate child or an illegitimate child who qualifies to "be treated the same as if he were the legitimate child of his father".

2. Ind. Ann. Stat. § 29-1-3-8(b) (Burns Code Ed.) provides as follows:

"(b) If, at the time of the making of his will, the testator believes any of his children to be dead, and fails to provide for such child in his will, the child shall receive a share in the estate of the testator equal in value to that which he would have received if the testator had died intestate, unless it appears from the will or from other evidence that the testator would not have devised anything to such child had he known that the child was alive."

infrequent and his last correspondence with his parents was in 1949 or 1950.

Effie Pore died in 1963; daughter Margaret died in 1966; and Clyde Haskett passed away on December 12, 1968. Clyde's will which had been executed on October 25, 1968 did not mention Harry, leaving the estate to certain named legatees. Max Haskett, Clyde's nephew, was one of the legatees and was named as executor.

The will was admitted to probate in Tipton Circuit Court on December 19, 1968. Harry returned to Tipton County and on June 6, 1969, filed a complaint to contest Clyde's will, alleging unsoundness of mind and improper execution.

Subsequently, on February 11, 1972, Harry filed a petition to determine heirs, alleging that he was the natural son of Clyde and Effie, that his parents had thereafter married, that Clyde had acknowledged his paternity, and finally that Clyde had believed Harry to be dead when he executed his will. Harry then dismissed the will contest.

Both parties made motions for Summary Judgment and submitted accompanying affidavits.

The affidavits introduced by Harry contain, *inter alia*, the following pertinent matter:

> As the landlord of Clyde and Effie, Earl M. Hoover heard Clyde openly and notoriously acknowledge Harry to be his natural son, calling Harry "my son, our son, my boy" innumerable times.

> David Bussler, Margaret's husband and Clyde's son-in-law, heard conversation between Margaret and Clyde in 1959 or 1960 in which both indicated or stated their conclusion that Harry was dead.

> Reverend Charles Jennings mentioned Harry to Clyde on an occasion. Clyde's response indicated that he thought Harry was "most likely dead" since he had not been heard from in a long time.

> Ruth Maines, Clyde's niece, assumed Clyde thought Harry to be dead because Clyde stated that he didn't know what to do with an insurance policy he had on Harry.

Legatees introduced affidavits from persons who were acquainted with Clyde in his last years. These affidavits stated that Clyde had never mentioned a son to the affiants.

Also submitted at this time were Harry's birth certificate[3] and the marriage certificate of Clyde and Effie Haskett. These were entered in the record as "admitted into evidence without further proof."

After a hearing, the trial court entered, on June 9, 1972, a finding that Harry was "a son and heir at law of Clyde Haskett."

On October 27, 1972, legatees filed a motion to dismiss the proceedings, alleging lack of subject matter jurisdiction in that the petition to determine heirship was filed subsequent to the expiration of the six month limitation on actions to contest a will. The motion was overruled.

The matter proceeded to trial on the question of whether or not Clyde believed that Harry was dead at the time the will was executed. The pre-trial order stated that the affidavits were "offered, introduced and received in evidence in this cause." Evidentiary objections and rulings were noted at the time both attorneys signed the pre-trial order.

At trial itself, the affidavits were not additionally or formally introduced or admitted into evidence. Testimony was heard and a deposition of David Bussler, Clyde's son-in-law, was introduced and admitted. Contained therein was the following passage:

"Q. Now, from your observation and knowledge of Clyde Haskett have you an opinion as to whether or not Clyde Haskett of your own knowledge thought his son was alive or dead?

A. I believe ———

Q. Yes or no answer Dave there. Either you do or you don't have an opinion.

A. Yes. I do.

---

3. The facts were further complicated at trial because Harry Haskett during his absence assumed the *nom de plume*, Nolin Dunne, in connection with missionary work and authorship of Gospel Songs.

Q. What is your opinion then?

A. I believe that the man actually thought his son was dead."

At trial, legatees claimed Bussler's conclusion to be objectionable as the opinion of a lay witness.

On September 25, 1973, the trial court entered judgment in favor of Harry Haskett, determining that he was a son and heir at law of Clyde C. Haskett, and that Clyde Haskett made his will under the belief that his child, Harry Haskett, was dead and therefore failed to provide for him in his will.

The disappointed legatees argue five contentions:

1. The trial court improperly granted a partial summary judgment upon the issue of Harry's status as an heir.
2. The trial court erred in overruling appellant's Motion to Dismiss grounded on failure to satisfy the six month limitation for will contests.
3. The trial court committed reversible error by considering affidavits which were not re-introduced or admitted into evidence at the hearing.
4. The trial court improperly considered the opinion evidence of David Bussler.
5. The decision of the court was not sustained by sufficient evidence.

## PARTIAL SUMMARY JUDGMENT ISSUE NOT PRESERVED AS ERROR

The purported issue concerning a "partial summary judgment" was not properly raised nor preserved in the trial court and accordingly is not before us.

Careful examination of the Motion to Correct Errors discloses no allegation that the trial court improperly granted a motion for summary judgment as to a disputed fact, i.e. Clyde's acknowledgement of paternity. Such assertion is necessary in order to properly present error on appeal. Ind. Rules of Procedure, Trial Rule 59 (G), *Richards* v. *Crown Point Community School Corp.* (1971), 256 Ind. 347, 269 N.E.2d 5.

## SIX MONTH FILING LIMITATION UPON WILL CONTESTS NOT APPLICABLE TO PETITIONS TO DETERMINE HEIRSHIP

Legatees contend that the petition to determine heirship was actually an action to contest a will which, pursuant to Ind. Ann. Stat., § 29-1-7-17 (Burns Code Ed.) must be filed within six months after a will is offered for probate. In the alternative, legatees allege that the will contest statute and the petition to determine heirship statute, Ind. Ann. Stat. § 29-1-6-6 (Burns Code Ed.) should be construed in *pari materia,* and that therefore the six month limitation of the will contest statute should be read into the statute governing petitions to determine heirship. Ind. Ann. Stat. § 29-1-7-17, *supra,* makes clear, and judicial construction has confirmed, that a will may be contested thereunder for only two causes: (1) unsoundness of mind of the testator, and (2) undue execution of the will. *Jarrett* v. *Ellis* (1923), 193 Ind. 687, 141 N.E. 627.[4] Clearly the petition to determine heirship is not built upon such foundations.

The petition of a pretermitted heir is not a will contest, nor does it seek to void the will. *See Farber's Ex'r.* v. *Farber* (1940), 282 Ky. 373, 138 S.W.2d 986; 26A C.J.S. § 45, *Descent and Distribution.* The pretermission statute has only the effect of removing the heir's intestate share from the testate property in the estate. The will is therefore rendered inoperative *pro tanto* but is operative in all other respects. The petition herein cannot be classed as a complaint to contest a will.

The petition was made pursuant to Ind. Ann. Stat. § 29-1-6-6, (Burns Code Ed.), which reads in part:

"(a). *At any time during the administration of a decedent's estate,* the personal representative or any interested person may petition the court to determine the heirs of said decedent and their respective interests in the estate or any

---

4. Although the *Jarrett* case interprets a prior statute, the present statute is to be construed as was the former. *State ex rel. Matheny* v. *Probate Court of Marion County* (1959), 239 Ind. 518, 159 N.E.2d 128.

part thereof. Upon the filing of the petition the court shall fix the time for the hearing thereof, notice of which shall be given to all persons known or believed to claim or have any interest in the estate or any part thereof as heir or through an heir of the decedent. In addition, notice by publication shall be given to all unknown heirs of the decedent." (Emphasis supplied)

Legatees assert that the six month limitation must be inserted in the above statute under the doctrine of *pari materia.* However, the doctrine, as with other tools of statutory construction, is to be utilized only when the language of the questioned statute is unclear or ambiguous. *Indiana State Highway Commission* v. *White* (1973), 259 Ind. 690, 291 N.E.2d 550; *Grody* v. *State* (1972), 257 Ind. 651, 278 N.E.2d 280.

Even were we to view the language "At any time during the administration of a decedent's estate" as ambiguous or unclear, we cannot say that the will contest statute is a statute which has "the same purpose or object" [*City of Muncie* v. *Campbell* (1973), 156 Ind. App. 59, 295 N.E.2d 379] as the petition to determine heirs provision. Thus, the doctrine of *pari materia* has no application to the case before us.

The petition was timely filed and the trial court properly overruled appellant's motion to dismiss.

## TRIAL COURT DID NOT ERR IN CONSIDERING THE AFFIDAVITS

Legatees contend that the affidavits supportive of Harry's claim were not introduced or admitted into evidence at the trial and therefore could not be considered by the trial court or by this court.

Neither the motion to correct errors nor the accompanying memorandum makes reference to this alleged error. Indeed, the motion to correct errors itself relies upon evidence contained in the affidavits to support legatees' arguments on other points.

While the issue may have been waived insofar as the propriety of the trial court's consideration, it is necessary for us to determine whether the evidence was of record before we may consider it as supportive of the trial court's determination. *See Hardin* v. *State* (1973), 260 Ind. 501, 296 N.E. 2d 784.

As previously discussed, the case was heard at trial under the provisions of Ind. Ann. Stat. § 29-1-6-6, Section (B) of which provides:

"(B) Upon the hearing of the petition, *heirship may be determined by competent evidence or, if there be no objection, by affidavit.* A record shall be made of all oral evidence, and such record and all affidavits shall remain as part of the files in the estate proceeding." (Emphasis supplied)

Clearly, legatees at trial voiced no objection to the use of the affidavits in determining the issues. Indeed, their active consent is evidenced by their referral to the affidavits and by their counsel's signature upon the pre-trial order wherein the affidavits are referred to as being "offered, introduced and received in evidence in this cause."

While we encourage parties and trial courts to resolve all questions of admissibility prior to trial as per Indiana Rules of Procedure, Trial Rule 16, we may not acknowledge the formal "receiving", i.e., admitting, of trial evidence with respect to a contested fact issue other than during the trial itself. Evidence necessary to establish an ultimate fact in controversy as essential to judgment must come before the court during trial—not before and not after. *See Hardin* v. *State, supra; Brattain* v. *Herron* (1974), 159 Ind. App. 663, 309 N.E.2d 150. Here, however, both parties acquiesced in and indeed encouraged consideration of the affidavits by the trial court; the appropriate statute, § 29-1-6-6 (B), contemplates such consideration; the trial court openly relied upon the affidavits without objection; and the affidavits are part of the certified record on appeal. It would be manifestly unjust to further delay this litigation, already too long moldering in the courts, in order to direct retrial of the issues

for the purpose of formally admitting into evidence the affidavits. *See Lowe* v. *Talbert* (1931), 93 Ind. App. 384, 176 N.E. 36, *rehearing denied,* 93 Ind. App. 384, 117 N.E. 339, *Pfau* v. *Whitcover* (4th Cir. 1943), 139 F.2d 588.

## ERROR, IF ANY, IN CONSIDERING "OPINION" EVIDENCE AS TO CLYDE'S STATE OF MIND WAS HARMLESS

Legatees argue that the following testimony contained in David Bussler's deposition was inadmissible as the conclusion or opinion of a lay witness:

"Q. Do you know whether or not he agreed when asked about it that Harry Haskett was dead?
A. I think he felt in his own mind that he was.
\* \* \*
"A. I believe that the man actually thought his son was dead."

It is our opinion that error, if any,[5] was harmless. The trial was to a judge sitting without a jury. As we recently stated in *King* v. *State* (1973), 155 Ind. App. 361, 292 N.E.2d 843, 846-47:

"It has long been held in Indiana that harm arising from evidentiary error is lessened if not totally annulled when the trial is by the court sitting without a jury. *Shira* v. *State* (1918), 187 Ind. 441, 119 N.E. 833.
What might very well constitute prejudicial error in the form of testimony given before a jury does not necessarily constitute prejudicial error in a trial to the court. It must be remembered that a trial judge is presumed to know the intricacies and refinements of the rules of evidence and that he sifts the evidence and weighs it in the light of his legal experience and expertise. He is thus able to separate the wheat from the chaff, ignoring the extraneous, the incompetent and the irrelevant and it is only when his judgment has apparently or obviously been infected by erroneously admitted evidence that we will set it aside. Rule TR. 61, IC 1971, 34-5-1-1."

5. A recent decision by District One of this Court, *Rieth-Riley Construction Co., Inc.* v. *McCarrell* (1975), 163 Ind. App. 613, 325 N.E.2d 844, abrogated the rule which per se excluded lay witness opinion as to ultimate facts in issue.

Moreover, even if the evidence was shown to have been improperly considered by the trial court, the evidence was merely cumulative. Other testimony by Bussler, as well as testimony from Rev. Jennings and Ruth Maines supported the determination that Clyde believed Harry to be dead. Erroneous admission of inadmissible evidence will not be grounds for reversal where such evidence is merely cumulative in nature. *Coffey* v. *Wininger* (1973), 156 Ind. App. 233, 296 N.E.2d 154, *Harter* v. *Brindle* (1969), 145 Ind. App. 411, 251 N.E.2d 590.

## EVIDENCE WAS SUFFICIENT TO SUPPORT THE TRIAL COURT'S FINDINGS AND JUDGMENT

The legatees finally argue that the evidence is insufficient to sustain the findings that Harry was Clyde's acknowledged son and that he was a pretermitted heir.

The statutes under which Harry Haskett claimed his inheritance, being Ind. Ann. Stat. §§ 29-1-2-7 and 29-1-3-8 (Burns Code Ed.), *supra,* required Harry to bear the burden of proving the following contested facts:

1. That his parents had married following his birth.
2. That Clyde Haskett, his putative father, had acknowledged Harry to be his own child, and
3. That at the time Clyde executed his will, he believed Harry to be dead.

The evidence supports the findings as to these three elements.

The marriage certificate establishes the marriage of Clyde and Effie Haskett. The affidavit of Earl Hoover, *supra,* establishes acknowledgment.

As was stated in *Horner* v. *Boomershine* (1938), 88 Ind. App. 57, 61, 161 N.E. 641:

"It is true, as contended for by appellants, that such an acknowledgment as the law contemplates must be one which is definite, certain and unequivocal, but the testimony of the witnesses above set out fully meets this requirement, amply satisfies the law upon this point, and sustains the verdict."

The decedent in *Horner* referred to the petitioner there as "his daughter", "my daughter", and to her husband as "my son-in-law". As the *Horner* court found these statements to amply satisfy the law, so do we find Clyde's references to "my son" and "my boy" sufficient to support the finding of heirship.

Finally, the affidavits of Jennings and Maines, and the deposition of Bussler, suffice to show that Clyde believed Harry to be dead.

Appellants contend that there was no *basis* for Clyde's belief that Harry was dead. Here there was nothing such as a "We regret to inform you" telegram from the government which would compel such a belief. However, the statute does not require that the belief be reasonable, or indeed that it have any basis at all. As was stated by the Kentucky Court of Appeals, adopting and quoting the written opinion of the lower court, in *Farber Ex'r. v. Farber* (1940), 285 Ky. 596, 148 S.W.2d 732, 734-35 (Opinion on Rehearing) :

> " 'A long line of witnesses who had known and been more or less intimate with John Ulrich Farber in his lifetime testified in the case. It is true that to some he stated that he did not know whether his son were living or dead, but these statements are shot through over a long period with such remarks as he "thought he was dead", "guessed he was dead" "he must be dead", and to a number of witnesses that "he was dead". To some he made the positive assertion; to others he made statements measuring well up to Webster's definitions of "belief" as "assent to a proposition or affirmation, or the acceptance of a fact, opinion or assertion as real or true, without immediate personal knowledge". The very condition of a belief is that the thing is not known.' "

* * *

> " '[1] This will contains no provision for or exclusion of plaintiff, and the proof establishes at the time of making the will and on to and including the time of his death testator believed his son dead. He did not have to know it; he did not have to have direct information on the question; as the statute does not even require reasonable grounds for the belief, or circumstances that might have thoroughly

convinced testator or another. It sets no measure of diligence to ascertain the fact. If he believed it, from whatever source or on whatever grounds, then the statute is operative. The reason for this is apparent. A testator may believe even on insufficient evidence that his child is dead, and at the same time the child in fact be dead; or he may, with hope ahead, refuse, under humanly convincing circumstances, to believe that a child, in fact dead, is dead, but cling to the consoling belief that he will yet return. For that matter, in order for the statute to apply the testator must always be wrong in his belief. He might by sufficient diligence find out that his belief is in error; but it is the very existence of the belief that works the injustice in the will which the statute was enacted to correct. It is not the ground of belief, but the presence of it, that arrests the operation of the will. The reasons for the belief may be such that few others would have so believed; but the question is, did the testator so believe? There is no "except" or "unless" in the statutory provision, but the belief, however induced or however it might have been removed, is made the controlling factor. It is not the fact of death, but the fact of the belief, that avoids the testamentary disposition as made.' "

It is true that the record contains conflicting evidence, or at least evidence from which conflicting inferences can be drawn. For example, late in his life Clyde did not discuss Harry with acquaintances. Legatees cite this as lack of acknowledgment. Conversely, however, such fact is subject to the inference that Clyde already believed Harry to be dead. Clyde refused to have Harry declared dead. Appellants point to this to negate the claim that Clyde believed Harry dead. However, it is equally susceptible to an inference that Clyde still felt shame at his long past transgression. Indeed, David Bussler cites the latter as the real reason: "He wouldn't hear anything about it because he would have had to come to court and admit it, that he had a boy. [T]o most people Margaret was the only child he ever had."

These conflicts but serve to point up the reason for the rule that:

"In reviewing the evidence, on appeal, we look to the evidence most favorable to the appellee to determine if

there is substantial evidence of probative value or reasonable inferences therefrom to sustain the decision of the trial court. We will reverse the decision only if the evidence and reasonable inferences are undisputed, and could only lead to a decision contrary to the one arrived at by the jury." *Palmer* v. *Decker* (1970), 253 Ind. 593, 255 N.E.2d 797, 798.

Legatees asserted during oral argument that Harry failed to prove an additional essential element, i.e., that his father did not intend to disinherit him. Legatees misread the statute. The statute creates a presumption that the decedent did not intend to disinherit the pretermitted heir. It is the responsibility of respondents to introduce evidence that "the testator would not have devised anything to such child had he known the child was alive." Therefore, as to this element, legatees have suffered a negative decision. We may therefore reverse upon this issue only if reasonable men could not have arrived at the same conclusion reached by the court. We do not find the evidence to be so one-sided.

The legatees point to many items of testimony to establish that Harry was undeserving of the inheritance—that he voluntarily absented himself from the family circle, failed to communicate with them for decades, and reappeared only when his mother, father and sister had already departed the earth. These and other facts might sustain a finding by the trial court that Harry was undeserving of his father's bequest but they do not prove that he would not have received it.

The pretermitted heir statute is not designed to effectuate any moral obligation of a parent in favor of a child worthy of his beneficence. Rather, the law attempts to carry out the presumed intent of the testator. Thus, the statute may not be avoided by a showing that decedent *should* not have provided for the child, but only upon the ground that he would not have done so.

Finally, legatees allege generally that the statute is unfair in its application herein—that it was never intended to apply

to a child who voluntarily remained out of touch with his family. They quote from criticism of similar provision in Mathews, *Pretermitted Heirs: An Analysis of Statutes,* 29 Columbia L. R. 748, 765:

> "If the parent's behavior has driven the child from home, the ordinary provisions meet the case well enough—the parent may, and doubtless will, disinherit him; but if the child has voluntarily absented himself matters take on a different light. In 1808 such a disappearance was perhaps not infrequent and might readily enough lead to disinheritance based on a mistaken belief in his death. The great expanses of wilderness and the absence of communication of those days, coupled with the adventuresome spirit of the pioneer, made this far from unlikely. Under such conditions it would have been altogether probable that the parent still wanted the son to inherit, if later he appeared. But nowadays the circumstances are different. Except in time of war, a child is not likely to be absent and mistakenly reported dead, and at the same time be the sort of child for whom the parent is either likely to want to provide, or ought to provide. The chances are he is worthless, irresponsible and devoid of a sense of filial obligations. What was an accidental loss of contact in 1808 has become a deliberate abandonment in 1929; a case worthy of solicitude once but no longer."

This reasoning seems even more persuasive in 1975. However, we cannot void a duly enacted, and constitutional statute upon assertions that it has outlived its usefulness, that the situation it purports to remedy is anachronistic in today's society, and that its application can only work mischief. Just as we must defer to the trial court's weighing of the evidence, so must we also defer to the legislative branch for a determination whether statutes continue to serve the needs of the people of Indiana.

The judgment of the trial court is affirmed.

Buchanan and White, JJ., concur.

NOTE.—Reported at 327 N.E.2d 612.